# WHEELING.

## CHIPPS *et al. v.* HALL.

Submitted June 12, 1883—Decided March 15, 1884.

1. A testator devised to his wife a tract of land to have and to hold during her natural life, and after her death to his son during his natural life, and at his death it was to descend to his heirs. HELD : .

     The rule in *Shelley's Case* is applicable to such devise ; and by this will the testator's widow had an estate for her life in this tract of land, remainder to testator's son in fee simple. (p. 509.)

2. This construction of the will would not be changed, though other parts of the will had shown in the clearest manner, that the testator did not intend his son to have any more than an estate for his life in this tract of land. (p. 520.)

GREEN, JUDGE, furnishes the following statement of the case:

This was a chancery suit instituted in the circuit court of Monongalia. The bill was filed at July rules, 1881, and is as follows:

"*To the Hon. A. B. Fleming, Judge of the Circuit Court Monongalia county:*

"Rachel Chipps, Irwin Scott, George Scott, Jacob Scott, Alexander Scott, Malinda Thatcher, James Huffman, Alphias Scott, Sarah B. Stevens, Louisa Scott, Jacob Scott, Alexander Ash, George C. Huffman, Margaret J. Morrison, Amzi Morrison, Louis S. Huffman, Catharine Thornton, Silas Thornton, Lucy M. Wright and Webster Wright, the said Rachel Chipps ——— being heirs-at-law of Jefferson Scott, deceased, plaintiffs, against Ephraim B. Hall, defendant.

"The plaintiffs respectfully represent unto your Honor that in the year 1846 David Scott departed this life in said county testate, possessed of a large and valuable real estate, mostly in said county, which he disposed of by his will, and codicil thereto; that the said Scott was a plain, unlettered farmer, and his said will and codicil were drawn by one Caleb Tanzy, a near neighbor, and also a plain farmer; that the said Scott had numerous children, all of whom he provided for in said will; that among them was one unmarried son, then some thirty years of age, who was very dissipated and an habitual drunkard, as were also Enoch Huffman, the husband of his daughter, Maria Huffman, and Forbes Chipps, the husband of his daughter, Rachael Chipps, the plaintiff; that as will be seen by a copy of said will and codicil herewith filed as a part of this bill, marked No. 1, the testator devised certain tracts of land to certain of his children absolutely, and to the said Jefferson Scott, Rachael Chipps and Maria Huffman each a tract of land for life only, and at their death, respectively, the same was to go to their respective heirs. The tract so devised to the said Jefferson contained one hundred and sixty-five acres, being the home tract, situated in this county, and the most valuable of them all, and is the same now in the possession of and claimed by the defend-

ant, and as will be seen the devise to Jefferson and his heirs was subject to the life estate of the widow of said testator, who survived him some ten years.

"And the plaintiffs further represent that the said Jefferson Scott, on the 1st day of June, 1852, being before the death of his mother, the widow of said testator, conveyed one half of his interest in said tract to one Enoch Scott, and on the 21st day of February, 1853, he conveyed the residue of his said interest to one Levi Lowe and James C. Snider, as will appear by copies of said deeds herewith filed as part of this bill marked No. 2.

"And on the 10th day of May, 1869, the said James C. Snider conveyed the whole of said tract to the defendant, Hall, as will appear by a copy of said deed herewith filed as a part hereof marked No. 4, the said Snider having before acquired by deeds the interest of said Lowe and Enoch Scott in said tract; that the said Jefferson Scott sold his interest in said tract for little, if any, more than a nominal price, and soon afterwards removed with his brothers and sisters to the west where he recently, to-wit, about the ———, died intestate, never having married, and leaving the plaintiffs hereinbefore named as such his only heirs; that the said tract of land was very valuable at the time, and much more so at present, being now worth annually at least five hundred dollars; that of the said heirs, Rachael Chipps, a sister of said Jefferson, is entitled to one undivided —— part of said tract; that the reason said David Scott assigned both before and after the will and codicil was executed for limiting the said Jefferson and Rachael Chipps and Maria Huffman to *life* estates only, was that the estate so devised should not be wasted and used up in drink, &c., and he directed the said Tanzy to give them life estates only, and supposed up to the time of his death that it was the case, as did also the said Tanzy.

"To the end therefore that they may be relieved in the premises, being without adequate remedy at law, the plaintiffs pray that the defendant above named may be made a party defendant and compelled to answer this their bill and any allegation thereof, and the premises considered; that the said tract of land may be, if practicable, partitioned among the plaintiffs as heirs of said Jefferson Scott accord-

ing to their respective interest therein; that the said Hall be compelled to account to them for the rents and profits of said tract from the time of the death of said Jefferson Scott, and also for further and general relief in the premises. And they will ever pray, &c.

"BERKSHIRE & STURGISS,
                    "*Attorneys for plaintiffs.*"

The will of David Scott filed as an exhibit with this bill has in it the following provisions, which, it is claimed, throw more or less light on the true interpretation of this will as to the disposition of the one hundred and sixty-five acres of land, the subject of controversy in this suit:

"Item. I give and bequeath to my loving wife Mary all my household and kitchen furniture and as I have divided my Richwood tract of land in three lots or tracts by survey lot numbers beginning, &c., "(the metes and bounds are then set out)" containing one hundred and sixty-five acres. This lot or tract No. 1 I give in the manner following:

"Item. I give and bequeath to my wife, Mary, lot No. 1, containing one hundred and sixty-five acres, to have and to hold during her natural life, and four hundred dollars out of the proceeds of the sale of said lot No. 1, as she directs in her last will and after her death this lot No. 1 to be sold and the proceeds be divided in manner and form following—that is, four hundred dollars to my wife, Mary, as above stated.

"Item. I give and bequeath to my daughter, Hannah Chesney, two hundred dollars out of the proceeds of the sale of lot No. 1.

"Item. I give and bequeath to my son Jefferson, two hundred dollars out of the proceeds of sale of lot No. 1. Lot No. 2 being a part of the Richwood tract of land, I give and bequeath to my daughter, Maria Huffman, during her natural life and then to descend to her legal heirs "(the boundaries of this lot are then set out at length)" containing one hundred and twenty-six acres.

"Item. I give and bequeath to my daughter Rachel Chipps, lot No. 3, it being part of the Richwood tract of lands, during her natural life, and then to descend to her legal heirs" (then follows the metes and bounds of lot No. 3 at length) "containing one hundred and eight acres." Then

follow numerous bequests and devises to his various children. In the several devises of land made to his other children he uses such language as the following:

"Item. I give and bequeath to my daughter or son" (naming him or her) "a specific number of acres of land known as such a tract, giving its name and location."

There are five such devises contained in the will and the language of each of them is very nearly the same, and they are each of them substantially worded as above stated. In the will he also gives to one of his daughters and her husband fifty dollars out of the sale of lot No. 1 of land before mentioned. The other clauses of the will are bequests to his different children. The will is dated November 26, 1842; and to it is appended the following codicil:

"I, David Scott, of the county of Monongalia and State of Virginia, do hereby make this codicil to my above will, in manner and form following, that is to say: After mature reflection upon my son, Jefferson Scott, and become much better pleased with his behavior, and having due respect for him as a son, and hoping that he may be reformed and become a good citizen, do therefore desire to amend my above will so far as it relates to him and my wife, Mary.

"Item. I give and bequeath to my son Jefferson, after the death of my wife, Mary, lot No. 1 mentioned in my above will, with all the personal estate that may remain at her death after paying all her debts, during his natural life, and at his death, then to descend to his heirs; provided, however, that nothing in this amendment shall be construed to prevent my daughters, Hannah Chesney and Catharine Barackman, being paid the sums bequeathed to them in the above will.

"In witness whereof, I have hereunto set my hand and affixed my seal this tenth day of March, in the year of our Lord one thousand eight hundred and forty-six.

"DAVID SCOTT.    [SEAL.]"

The defendant, Ephraim B. Hall, filed an answer to this bill, to which the plaintiffs replied generally, and various depositions were taken proving substantially the facts stated in the bill, which depositions were excepted to for want of relevancy. It is deemed unnecessary to state the contents of

the answer of the defendant, as in my judgment the bill on its face shows, that the plaintiff's had no cause of action, and it should have been dismissed for this cause at the hearing.

A final decree was entered in this cause on October 20, 1881, as follows:

"This cause came on this day to be finally heard on the bill and answer of defendant, Hall, and general replication thereto, exhibits and depositions and agreement of counsel marked 'agreement of counsel,' and was argued by counsel. And it appearing to the court that under and by virtue of the last will and testament of David Scott, including the codicil thereto, said will bearing date the 26th day of November, 1842, and the said codicil of the date of March 10th, 1846, and both duly proven and recorded, his son, Jefferson Scott, took an absolute fee simple estate in and to the one hundred and sixty-five acres of land so devised to him after the death of testator's widow; and that the defendant, Hall, claims and owns the same now by and through a regular and unbroken chain of title thereto, derived from said Jefferson Scott, and that said plaintiffs have nothing in said land, on consideration whereof, it is adjudged, ordered and decreed that the plaintiffs' bill be dismissed and that the said defendant recover against them his costs herein expended."

From this decree the plaintiffs obtained an appeal and *supersedeas* to this Court.

*Berkshire & Sturgiss* for appellants.

*P. H. Keck* for appellee.

GREEN, JUDGE:

The question involved in this case is: Does the rule in *Shelley's Case* apply to the devise by David Scott by the codicil to his will of lot No. 1, (one hundred and sixty-five acres of land) to his son Jefferson, after the death of the testator's wife, to whom by his will the testator had devised it during her natural life? The devise to his son, Jefferson, by the codicil is, "during his natural life and at his death then to descend to his heirs." If the rule in *Shelley's Case* applies, then the will and codicil devises the lot to the testator's

widow for her life, remainder in fee to his son, Jefferson.  If the rule in *Shelley's Case* is not applicable, then the devise is to the widow for life, remainder to the testator's son, Jefferson for life, remainder to such persons as at the death of his son Jefferson would answer the description of his heirs, that is, to the plaintiffs in this cause.

The testator, David Scott, died in 1846, when the rule in *Shelley's Case* was in full force in Virginia, the statute designed to abolish it having been inserted in the Code of Virginia of 1849.  This statute was thus worded :  "When an estate real or personal is given by deed or will to any person for his life, and after his death to his heirs, or to the heirs of his body, the conveyance should be construed to vest an estate for life only in such person, and a remainder in fee simple in his heirs or the heirs of his body."  See Code of Virginia 1849, ch. 116, §11, p. 501 ; Code of 1860 p. 559 and 560 ; Code of West Virginia, ch. 71 §11 p. 461.  This statute, if it does not entirely abolish the rule in *Shelley's Case*, certainly leaves but few cases which can come within its operation, when the deed has been made or the will executed, and the testator died since July 1, 1850, when this Code of 1849 went into effect.  But the will in this case having been made and the testator having died before July 1, 1850, of course this statute can have no effect on the construction of this will.

The rule in *Shelley's Case* has given rise to almost endless disputes and bitter controversies.  The rule was obviously not intended as a means of discovering the intention of the grantor or testator.  This was left to be otherwise discovered. But when the intention had been ascertained, this rule controlled the intention, so far as it was repugnant to public policy.  The person making by deed or will such a limitation, as comes within the rule in *Shelley's Case*, had in his mind two purposes, which were legally in conflict.  One was to give to the ancestor only a life-estate, and the other was to limit the land to his heirs as such collectively and in indefinite succession.  It was held that these two interests could not stand together without producing much public mischief.  Now when these two intents appeared in a deed or will, under the rule in *Shelley's Case* the second intent, to

limit the land to the heirs in indefinite succession was pre-
ferred, and the first intent, to give the ancestor a life-estate
only, no matter how clearly it was expressed, was set aside.
And as the only means of effecting this second intent, the
rule in *Shelley's Case* was adopted; and the ancestor was de-
clared to have a fee simple estate or an estate tail. There
was generally no difficulty in ascertaining the first intent of
the grantor or testator. It was almost always clearly ex-
pressed, and in all the cases nearly it was entirely clear, that
the ancestor was intended to have a life-estate only, and it
was often, when the rule in *Shelley's Case* was applied, ex-
pressly declared, that the ancestor should have no more than
a life-estate. But under the operation of this rule this estate,
though it was expressly declared that it should not exceed a
life-estate, was declared by the courts to be a fee simple, be-
cause it appeared by the deed or will that the grantor or tes-
tator intended that the estate on his death was to go to his
heirs collectively and in indefinite succession. But this sec-
ond intent very often did not appear so clearly as this first
intent, and whether the grantor or testator did intend, that
after the death of the life-tenant the land should go to his
heirs collectively and in indefinite succession as such, or
whether he intended it to go to his heir apparent or to his
children or to some other particular individuals in the eye of
the grantor or testator, when he made the deed or will, was
very often the subject of bitter controversy.

Some courts were disposed in ascertaining the second in-
tent to lean strongly in construing the deed or will to a con-
struction which would regard the grantor or testator as
intending that after the death of the life-tenant the land
should go to its heirs collectively and in indefinite succession,
and thus bring the case within the operation of the rule in
*Shelley's Case*; and the person declared in the deed or will as a
life-tenant was declared by the courts as a tenant in fee or
in tail as the case might be. But other courts were disposed
in ascertaining the second intent to lean strongly in constru-
ing the deed or will to a construction which would regard
the grantor or testator as intending that after the death of
the life-tenant the land should go to his heir apparent, to his
children or to some particular individuals contemplated by

the grantor or testator, when the deed or will was made, and thus the case was held by such courts to be not within the operation of the rule in *Shelley's Case*, and the life-tenant was held to have only a life-estate, and the land went to the heir apparent, the children or other particular persons supposed to be intended as remainder-men.

Sometimes the word "heirs" used in describing the persons, to whom the estate should go after the death of the life-tenant, under this peculiar wording of a deed or will, was construed to mean children or some particular class of heirs in the contemplation of the grantor or testator, and thus the rule in *Shelley's Case* was declared to have no application. Sometimes the word "children" or some other word used in describing the person, to whom the estate should go, was construed to mean "heirs" in its technical sense, and the land construed to be limited to the heirs of the life-tenant collectively and in indefinite succession. Then of course the rule in *Shelley's Case* was declared applicable and the life-tenant was declared to be the owner of the land in fee simple or in fee-tail.

There were a vast number of very nice distinctions drawn in the effort to lay down rules whereby this second intent of the grantor or testator was to be ascertained. In *Moon and wife* v. *Stone's Ex'or et al.*, 19 Gratt. 130, the counsel discussed at great length these nice distinctions taken by the courts; and those who are anxious as to these nice distinctions, I refer to the argument of the counsel in that case. It occupied one hundred and ninety-three printed pages of the report. But fortunately for us there is no necessity in this case to consider or investigate these; as I am of opinion, that in this case according to all the authorities the rule in *Shelley's Case* is obviously applicable. All the authorities agree, that if after the death of the tenant for life the land is to go to his "heirs," it must be considered, that the testator or grantor used the word "heirs" in its technical sense as importing a class of persons to take *indefinitely in succession*, and therefore the rule in *Shelley's Case* is in such case applicable. But if to the word "heirs" used as designating who were to take, the grantor or testator has added qualifying words, these qualifying words would in some cases show,

that the grantor or testator did not use the word "heirs" in its *technical sense*, but that he used it inaccurately as designating particular individuals only, as, for instance, if the limitation was to the heirs of the life-tenant *now living*; for then clearly the word "heirs" must have been used as the life-tenants, heirs apparent or presumptive, when the limitation was made; and of course the rule in *Shelley's Case* would not then be applicable.

There have been many interesting controversies as to what qualifying words would thus change the word "heirs," when used to show, who was to have the estate after the death of the life-tenant, from its usual *technical sense* and cause it to be held to designate particular individuals only, and thus render the rule in *Shelley's Case* inapplicable. But fortunately we are not called upon in this case to look into and consider the numerous cases on this point. For in this case the word "heirs" is used in the will, which we are construing, to designate the persons who are to take the one hundred and sixty-five acres in controversy after the death of the life-tenant, without any words whatever of qualification; and in such case all the authorities agree, that the rule in *Shelley's Case* applies, and the life-tenant's estate is thereby enlarged from a life-estate to a fee simple.

The precise terms of the rule in *Shelley's Case* are: "Whenever the ancestor by any gift or conveyance takes an *estate of freehold* in lands or tenements, and in the same *gift or conveyance* an estate is afterwards limited by way of *remainder* either mediately or immediately to *his heirs* or heirs of his body, the word '*heirs*' or 'heirs of his body' are words of *limitation* of the estate carrying the inheritance to the ancestor, and not *words of purchase* creating a contingent remainder in the heirs." See 2 Th. Co. Lit. 143; Fearne's Rem. 29, 28, n. (1); *Shelley's Case*, 1 Co. 219, 88 b., Pt. 1; Thomas's Ed. Minor's Institutes vol. 2 pp. 341, 342. From this definition it is evident, that, where the rule in *Shelley's Case* applies, these five requisites must concur: 1. There must be an estate of freehold in the ancestor, or as he has sometimes been loosely called the first taker. 2. The ancestor must take the estate of freehold by or in consequence of the *same assurance* which contains the limitation to his heirs.

3. The word "heirs" must be used in its *technical sense* as importing a class of persons to take indefinitely in succession. 4. The interest limited to the ancestor and that to his heirs must be *of the same quality*, that is, both legal or both equitable; for otherwise they could not coalesce. 5. The estate limited to the heirs must be limited by *way of remainder*.

Now the appellants' counsel insist in argument that these requisites do not all exist in this case, and that therefore the rule in *Shelley's Case* can not be applied. First it is insisted, that the first of these requisites does not in this case exist, that is, that by the will of David Scott a freehold estate was not devised to his son Jefferson the ancestor of the plaintiffs, but that the devise to Jefferson Scott of a life-estate was by the will to commence in the future, and therefore could not be a vested remainder but necessarily *an executory devise* and good only as such, and therefore the limitation over to his heirs was necessarily an executory devise, as all subsequent limitations after an executory devise must be executory devises; and that as a consequence the fifth requisite, that the estate limited to the heirs must be limited by way of remainder does not exist.

The counsel is right in his position, that the rule in *Shelley's Case* is not applicable to executory limitations, because the limitation to the ancestor and to the heir, if they were both of them executory limitations, would not be parts of the same estate but would be distinct and independent dispositions of the subject. See Fearne Rem. 276; 2 Min. Inst. 376. If the appellants' counsel is right in his position, that the devise to Jefferson Scott and the limitations to his heirs are executory devises, then the rule in *Shelley's Case* would be inapplicable; for being distinct and independent estates and not parts of the same estate they could not coalesce and form an estate in fee in Jefferson Scott, as they must do, if the rule in *Shelley's Case* be applicable. But most obviously the appellants' counsel is in error in the premises he assumes. For neither the estate of Jefferson Scott nor the limitations to his heirs are executory devises, but both of them are most obviously remainders. The definition of an executory devise is: "That it is such a limitation of a future estate or interest in land as *is contrary to the rules of limitation* in con-

veyances at common-law." Fearne on Rem. 386 and n. 6;
*Id.* 10 *et seq.* and n. 1.   Of course an estate can never be con-
strued to be an executory devise or limitation, if it be possi-
ble it should take effect as a *remainder.*   Now the estate of
Jefferson Scott is most obviously not only a *remainder* at
common-law but a *vested remainder.*   The definition of a
vested remainder is " a remainder limited to a certain person,
and on a certain event so as to possess *a present capacity* to
take effect in possession should the possession become vacant."
Fearne Rem. 216; Min. Inst. 337.   The estate of Jefferson
Scott under this will comes exactly within this definition.   It
is limited to a certain person, Jefferson Scott, and on a cer-
tain event, the death of Mary Scott, which of course was
bound to occur and was in no way contingent.

The appellants' counsel seem to think, that, because Jeffer-
son Scott might have died before Mary Scott, his estate
could not be a vested remainder but must be an executory
devise.   But every case on the subject and every text-book
refutes this proposition.   For instance, Minor in Institutes,
vol. 2 p. 337, says: "It should be observed, that it is not the
uncertainty of ever taking effect in possession, that makes a
remainder contingent; for to that every remainder is and
must be liable, since the remainder-man may die and die
without heirs before the determination of the particular estate.
The *present capacity* of taking effect in possession, if the pos-
session was to become vacant, and not the certainty that the
possession will become vacant, before the estate limited in
remainder determines, universally distinguishes a vested re-
mainder from one which is contingent.   Thus in case of a
lease for life to A. remainder to Z. for life, Z.'s remainder
may take effect in possession, because Z. may die before A.;
but being *capable of taking* effect in possession, if the posses-
sion were to fall in by the death of A., it is a *vested remainder.*
(Fearne's Rem. 216; 2 Black Com. 169, n. 10.)"

Of course if immediately after the death of the testator,
David Scott, his wife, Mary, had died and the possession
for life of Mary Scott had thus fallen in, there was a *present
capacity* in Jefferson Scott then at once to take possession,
and therefore Jefferson Scott's estate in this one hundred
and sixty-five acres of land was immediately on the death of

the testator a vested *remainder.* In fact his interest is the very example put by Professor Minor to show to his students what is meant by a vested remainder. That his estate is a vested remainder is so plain and elementary, that I feel I should apologize for having said so much on the subject. My apology is, that able counsel insist, that his interest was an executory devise and in fact almost the whole of their argument is based on this strange assumption.

That I may show more fully the justification of my setting out at length of elementary principles, I will make a brief quotation from the argument of counsel for appellants to show that they controvert the most elementary principles. They say: "To show that this case would not in a deed at common law come within the rule in *Shelley's Case,* it is only necessary to remember that a limitation of an estate to commence in future in a deed at common law was absolutely void." Of course this is true if there were no estate preceding, but it is equally true and equally elementary, that even an estate of freehold could by deed at common law be created to commence in future by way of remainder. And this is exactly what was done by David Scott's will for he left this one hundred and sixty-five acres to his wife for life, remainder to his son, Jefferson. And surely, though apparently disputed by appellants' counsel, nothing can be more elementary than that these estates thus created by will could have been in like manner created by deed at common law. The appellants' counsel seem too, by their argument to assume, that as Jefferson Scott did not have an estate of freehold in *possession,* he did not have such an estate of freehold, as by the definition of the rule in *Shelley's Case* the ancestor must have, for this rule to be applicable. The definition of the rule, as given above by all elementary writers, gives no countenance to such an idea. It simply says, that the *ancestor must have an estate of freehold.* But is it not an elementary principle, that a person may have an *estate of freehold* in a vested remainder, as easily as he can have *an estate of freehold in possession?* The counsel for appellants cite no authority to sustain this position that the ancestor's estate must be an estate of freehold in possession, in order that the rule in *Shelley's Case* may be applicable. All that they cite on

this point is 1 Tuck. Com. 137. The petition says: "To bring the case within the rule, the limitation over must be to the heirs of the *first taker*, who in this case is not Jefferson Scott, but his mother, who had a life-estate and a freehold by the will of her husband;" and the reference to Tucker's Com. is made to sustain this position. It is obvious that Tucker is misapprehended by the counsel; what he says is: "4. It is obviously an essential part of the rule, that the limitation over must be to the heirs of the first taker. Thus an estate to A., remainder to A.'s heirs is within the rule. For A.'s estate of life is capable of being enlarged by the subsequent words being considered as words of limitation. But an estate for life to A., remainder to the heirs of B. is not within the rule. B.'s heirs take as purchasers—they take a remainder in fee. The limitation to the 'heirs of B.' would not enlarge A.'s estate, and B. had no estate to enlarge."

These examples show most clearly what Judge Tucker meant by the words "first taker." He meant simply the "first taker" as between the remainder to the heirs and the devise to the ancestor. But there is nothing to indicate that the devise to the ancestor called by him the "first taker" might not as well be a devise of an estate in possession or the devise of a vested remainder. In the example put, where he says the rule applies, because A.'s estate might be enlarged by the remainder to his heirs, is it not obvious that if the estate was a vested remainder, it could as readily be enlarged by the remainder to his heirs, as it could be, if A.'s estate was one in possession? But the elementary books show expressly that a vested freehold remainder may be thus enlarged into a fee simple by operation of the rule in *Shelley's Case*. Thus Minor in his Institutes, vol. 2 p. 346, gives as an example of the application of the rule in *Shelley's Case*: "e. g. Grant to A. for life, remainder to B. for life, remainder to the heirs of A. and B. The ultimate limitation is not executed in possession jointly, but the rule applies and A. and B. take *several inheritances* and are tenants in common thereof. (2 Th. Co. Lit. 743–4; Fearne's Rem. 36; *Stephens* v. *Britridge*, 1 Lev. 36.) This is a case, where B.'s vested remainder for life was enlarged to a fee simple by the application of the rule in *Shelley's Case*."

The case of *Moon et ux.* v. *Brooks*, 12 Gratt. 135, was not only a case where a vested freehold remainder was by the application of the rule in *Shelley's Case* enlarged to a fee simple, but it was a case which strongly resembled this except that the remainder after the death of the ancestor was not as in this case simply to the heirs of the ancestor, but the ancestors, who were devised a vested remainder for life subject to the life-estate of their mother as in the case before us, were in that case two daughters; and the devise to them was during their "natural life, and no longer, and then it was equally to be divided between their heirs lawfully begotten." The court decided that the rule in *Shelley's Case* applied, and that these vested estates in remainder for life in these two daughters were enlarged into fee simple, the words "heirs lawfully to be begotten" being words of limitation and not of purchase. This case like the one before us was brought before the court after the abolition of the rule in *Shelley's Case* by the Code of 1849; but as the testator died before this Code went into effect, neither the court nor the counsel made a suggestion, that the provisions of the Code abolishing the rule in *Shelley's Case* could have any effect on the determination of the case. This seemed to be regarded by all as elementary, and yet this has been controverted in this case. There was no controversy about whether a vested freehold remainder could be enlarged into a fee by the operation of the rule in *Shelley's Case*; this was tacitly admitted on all sides; neither the counsel nor court say one word about there being a particle of difference between a case where the ancestor's estate was a vested freehold remainder or freehold remainder in possession. That there was no difference of this kind was tacitly admitted as a proposition too elementary to be discussed. The whole discussion was whether the words of the will that "then their shares should be equally divided between their heirs lawfully begotten," did or did not show that the word "heirs" was used in its ordinary technical sense. If it was, then it was admitted by the counsel on both sides and by the court, that it was an elementary proposition, that the rule in *Shelley's Case* would apply. If on the contrary these words showed that by "heirs lawfully begotten" was meant the children of these ancestors, the

daughters, or any other particular persons in the contempla-
tion of the testator, when the will was written, then the rule
in *Shelley's Case* did not apply, and these daughters would
have but life-estates.   The counsel, who contended that the
rule in *Shelley's Case* did not apply, did not rely on the fact
that the will gave the estate to the daughters for life and no
*longer*.  Nor did the court refer to this.  It being obviously
regarded as an elementary principle, that it made no differ-
ence whether the ancestor was given a life-estate simply or
was given a life-estate with the provision that he should hold
the estate no longer than during his life.  In truth it is
obvious that the intent of the testator that the ancestor
should have *only* a life-estate is equally obvious in either case.
But the only question discussed was whether the word
"heirs" was used in its technical sense.  The court after re-
viewing all the Virginia cases decided that it was, and there-
fore the life-estate of the daughters was enlarged by the rule
in *Shelley's Case* into fee simple.  Judges Daniel and Samuels
dissented.  They delivered no opinion; but the basis of their
opinion is perfectly apparent, and that is, that they thought
that the words of the will above quoted so qualified the
word "heirs," that the testator ought to be regarded by the
words "heirs lawfully begotten" to mean children of his
daughters.

In the case before us the word "heirs" to whom the estate
was to go after the death of the ancestor, Jefferson Scott, is
qualified in no manner whatever; and according to all the
authorities and text-books must be regarded as used in its
technical sense; and therefore upon elementary principles as
well as according to the case of *Moon et ux.* v. *Brooks*, 12
Gratt. 135, the rule in *Shelley's Case* must apply.  In fact it
seems to me, that in this case there is no ground for contro-
versy.  Every requirement of the definition we have given
of the meaning of this rule is obviously fulfilled, when they
are properly understood.  The other provisions of the will
really throw no light on this codicil.  They are relied on to
show, that the testator never intended to give to his son,
Jefferson, an estate in fee simple, as when he intended to
give a fee simple, as he did to his other children, he used
different language, and that he only intended to give his son,

Jefferson, a life-estate and no more. Depositions were taken to show too that the testator's son, Jefferson, as well as the husbands of the testator's two daughters, to whom he gave in similar language but life-estates, were dissipated, and that the testator often declared, that he had given these children but life-estates, because he did not want what he gave drank up. All this parol testimony is utterly irrelevant and inadmissible. All that it or any of the other provisions of the will tend even to prove is, that the testator intended to give to his son, Jefferson, nothing but a life-estate. Now if he had so expressly delared, it would make no sort of difference, as we have seen, in the interpretation of this will. It must be admitted as settled law, that the testator's intention to give only a life-estate to the ancestor would make no difference; and if the rule in *Shelley's Case* was applicable the life-estate of the ancestor would be enlarged to a fee simple, though the testator had expressly declared he should have only a life-estate. These or like words obviously do not in any way alter the will; for if the "ancestor is given a life-estate, remainder to his heirs," this means exactly the same as if the "ancestor was given a life-estate only remainder to his heirs." Such petty distinctions are wholly insufficient to change the meaning of the will.

This principle may now be regarded as almost elementary. Jarmin in his work on Wills vol. 2 page 339 says: "It is to be observed too that words however positive and unequivocal, expressly negativing the continuance of the ancestor's estate beyond the period of its primary express limitation will not exclude the application of the rule in *Shelley's Case.* For this intention is as clearly indicated by the mere limitation of a life-estate, as it can be by any additional expressions; and the doctrine let it be remembered is a rule of tenure, which is not only independent of but generally operates to subvert the intention." To sustain the proposition, that it makes no sort of difference how clearly it may appear that the testator did not intend to give the ancestor any more than a mere life-estate, Jarmin refers to the following authorities. *Robinson* v. *Robinson*, 1 Burr. 38, 2 Ves. Sr. 225, 3 B. P. C. Toml. 180; *Perrin* v. *Blake*, 4 Burr. 2579; *Hayes* d. *Foorde* v. *Foorde*, 2 W. Bl. 698; *Thong* v. *Bedford*, 1 B. C. C.

313; *Roe* d. *Thong* v. *Bedford*, 4 M. Sel. 362. I have treated this case thus far, as if the bequest of the vested remainder to life was to the testator's son Jefferson "remainder to his heirs," and have shown that if so expressed, the word heirs would have its usual technical meaning, and the rule in *Shelley's Case* would be applicable, and Jefferson's express estate for life would be enlarged into a fee simple. But the case before us is really stronger than this; for the language of the codicil is: "At his (Jefferson's) death then to descend to his heirs." How is it possible to suppose that the testator did not intend to use the word heirs in its strict technical sense? When lands descend it must necessarily be to the ancestor's heirs in the strict technical sense. A testator using this language could not possibly have been contemplating particular individuals only, he must have meant what he said, heirs, thereby meaning a class of persons to take indefinitely in succession; and as a matter of course the rule in *Shelley's Case* would then apply. The language used is so very strong to show that this was his meaning, that in my judgment it is doubtful, whether, if this will had been made after the abolition of the rule in *Shelley's Case*, the testator's son, Jefferson, would not still have taken a fee simple. For though the will does say, that this land is given to him during his natural life, yet when the testator adds that at his death it shall *descend* to his heirs, he used language utterly inconsistent with his son Jefferson having nothing but a life-estate in the land. No matter how ignorant the testator may have been, I cannot conceive that he did not know that a life-estate could not *descend* to a man's heirs on his death. He must have known, that in this State nothing but a fee simple estate descends to a man's heirs at his death. And in using such language he appears to have regarded himself as having given this land in fee simple to his son Jefferson. Even if the will had been made since the abolition of the rule in *Shelley's Case*, to hold that Jefferson had but a life-estate would be to disregard the plain and significant words that at his death this land should *descend* to his heirs. But I express no positive opinion on this point, for the will having been made and the testator having died before the abolition of the rule in *Shelley's Case*, it is entirely clear that Jefferson Scott took by the will a fee simple estate.

The plaintiffs have therefore no interest whatever in this land, as Jefferson Scott, they admit in the bill, sold and conveyed the whole of it to others in his lifetime; and as a matter of course their bill should have been, as it was, dismissed at their costs.

The final decree in this cause rendered by the circuit court on October 20, 1881, must be approved and affirmed and the appellee Ephraim B. Hall must recover of the appellants his costs in this Court expended and thirty dollars damages.

AFFIRMED.